UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CARLOS  MORELAND, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-269 |
| | § | |
| DON'SHAY  MCCOY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION
## ON PENDING MOTIONS

Plaintiff Carlos Moreland is a Texas inmate appearing *pro se* and *in forma pauperis*.  In this prisoner civil rights action, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Pending before the Court are the following motions: (1) Plaintiff's Motion for Preliminary Injunction (D.E. 156); (2) Motion for Summary Judgment filed by Defendants Chris Black-Edwards[1] and Lannette Linthicum(D.E. 178); (3) Motion for Summary Judgment filed by Defendants Kirk D. Abbott, Sara Hancock, Jessica Kahn, and Don'Shay McCoy (D.E. 182); (4) Plaintiff's Motions for Summary Judgment (D.E. 184, 185, 193); (5) a Motion to Strike Plaintiff's Motion for Summary Judgment filed by Defendants Black-Edwards and Linthicum (D.E. 202); (6) Plaintiff's Motion to Show Cause for Excusable Neglect (D.E. 208); (7) Plaintiff's Motion for Obstruction of Justice

---

[1] Plaintiff named Chris E. Black as a defendant in this case.  The record reflects, however, this defendant's name as Chris Black-Edwards.  (D.E. 137).

1 / 42

(D.E. 224); and (8) Plaintiff's motion to liberally construe his summary judgment motions and responses (D.E. 227).

For the reasons stated herein, the undersigned respectfully recommends that the Court grant the summary judgment motions (D.E. 178, 182) filed by Defendants. The undersigned further recommends that the Court: (1) grant the Motion to Strike (D.E. 202) filed by Defendants Black-Edwards and Linthicum; (2) strike Plaintiff's motions for summary judgments (D.E. 184, 185, 193), Plaintiff's untimely responses, Defendants' Advisory, Plaintiff's responses to the Advisory, and Plaintiff's motion to liberally construe his summary judgment motions and responses; (3) deny Plaintiff's Motion to Show Cause for Excusable Neglect (D.E. 208); (4) deny Plaintiff's Motion for Preliminary Injunction (D.E. 156); and (5) deny Plaintiff's Motion for Obstruction of Justice (D.E. 224).

## I.    JURISDICTION

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. This case was referred to the undersigned United States Magistrate Judge for case management and to furnish a recommendation pursuant to 28 U.S.C. § 636.

## II.    PROCEDURAL BACKGROUND

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is currently housed at the McConnell Unit in Beeville, Texas. Plaintiff named the following defendants in his original complaint: (1) Don'Shay McCoy, Hepatitis C (Hepatitis C) Specialist Physician; (2) John Doe, Supervisor Hepatitis C Clinic Protocol, Hepatitis C Clinic Treatment Committee; (3)

John Doe, Correctional Managed Healthcare, Hepatitis C Clinic Treatment Committee; and (4) Sara Hancock, Hepatitis C Specialty Physician. Plaintiff alleged that these defendants acted with deliberate indifference to his serious medical needs by failing to treat his chronic Hepatitis C and cirrhosis conditions in a timely and effective manner. Plaintiff sought injunctive relief against Defendants in their official capacities and monetary relief against them in their individual capacities. He also sought declaratory relief.

Along with his original complaint, Plaintiff submitted a Motion for Preliminary Injunction in which he sought an order directing Defendants to treat his Hepatitis C condition directly with direct acting antiviral ("DAA") medication. (D.E. 2). On October 1, 2018, Plaintiff filed a More Definite Statement. (D.E. 10). He subsequently filed an Additional More Definite Statement. (D.E. 36).

A *Spears*[2] hearing was held on November 20, 2018, where Plaintiff was given an opportunity to explain his claims. The next day, United States Magistrate Judge Jason Libby ordered the Office of the Attorney General ("OAG") to submit a response to Plaintiff's Motion for Preliminary Injunction and a *Martinez*[3] report to assist the Court in evaluating whether a preliminary injunction is warranted. (D.E. 18). The OAG subsequently submitted its response and *Martinez* report. (D.E. 23, 33). As part of the *Martinez* report, the OAG submitted evidence showing that Plaintiff had been approved

---

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

[3] *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *Cay v. Estelle*, 789 F.2d 318, 323 n.4 (5th Cir. 1986). *See also Cay v. Estelle,* 789 F.2d 318, 323 n.4 (5th Cir.1986) (approving the use of *Martinez* Reports in order to develop the factual basis of inmate claims).

to receive DAA treatment and was, in fact, receiving DAA treatment. (D.E. 33-1, pp. 8, 237-38, 242). Senior United States District Judge Hilda G. Tagle, therefore, denied Plaintiff's Motion for Preliminary Injunction as moot. (D.E. 42).

On February 8, 2019, the undersigned issued a Memorandum and Recommendation (February 8, 2019 M&R), recommending that Plaintiff's deliberate indifference claims be retained against Defendants in their individual capacities for monetary relief and that such claims seeking injunctive relief against Defendants in their official capacities be dismissed as moot. (D.E. 37). Specifically, the undersigned retained Plaintiff's claims that Defendants' actions in denying and delaying DAA treatments until after he had developed complications such as fibrosis and cirrhosis constitutes deliberate indifference to his serious medical needs. (D.E. 37, p. 10-11). The undersigned ordered service on the defendants named in the original complaint. (D.E. 38). Judge Tagle subsequently adopted the February 8, 2019 M&R. (D.E. 86).

On February 8, 2019, Plaintiff filed a motion seeking leave to file an amended complaint. (D.E. 39). Plaintiff identified the John Doe Defendants as: (1) Dr. Lannette Linthicum; (2) Dr. Jessica Khan; and (3) Melanie Roberts, who is a pharmacist for the University of Texas Medical Branch (UTMB). (D.E. 39, pp. 3-4).

The OAG filed an Advisory with the Court, seeking guidance on how to proceed with the additional defendants identified by Plaintiff. (D.E. 50). The OAG first identified the first John Doe Defendant as either Dr. Kahn or Dr. Linthicum. (D.E. 50, p. 1). The OAG stated that Ms. Roberts is not a part of either committee identified by Plaintiff and has no responsibility over Hepatitis C protocol or treatment decisions. (D.E. 50, p. 2).

Lastly, the OAG identified the second John Doe Defendant as either or both Kirk D. Abbott or Chris Black-Edwards, co-chairs of the Correctional Managed Health Care Committee (CMHCC)-Joint Infection Control Committee. (D.E. 50, p. 2).

On April 8, 2019, the undersigned conducted a telephone hearing with the parties to determine the appropriate defendants in this case. Plaintiff provided sworn testimony in which he agreed that: (1) Dr. Linthicum is an appropriate party in this case and should be substituted in place of the first John Doe Defendant; (2) Ms. Roberts is not a proper party in this case; and (3) Mr. Abbot and Mr. Black-Edwards should be substituted in place of the second John Doe Defendant.

On April 12, 2019, the undersigned granted Plaintiff's motion for leave to file an amended complaint and directed that same be docketed as his First Amended Complaint. (D.E. 55). The undersigned further directed the Clerk of Court to substitute: (1) Dr. Linthicum, Supervisor Hepatitis C Clinic Protocol, Hepatitis C Clinic Treatment Committee, in place of John Doe, Supervisor Hepatitis C Clinic Protocol Policy; and (2) Abbott and Black-Edwards, co-chairs of the CMHCC Joint Infection Control Committee, in place of John Doe, Correctional Managed Health Care, Hepatitis C Clinic Treatment Committee. (D.E. 55, p. 3). Lastly, the undersigned ordered service on Defendants Linthicum, Abbott, and Black-Edwards. (D.E. 55, p. 4).

On March 25, 2019, Defendants McCoy, Hancock and Khan filed a Motion to Dismiss. (D.E. 49). Defendants Abbott and Linthicum subsequently filed their respective motions to dismiss. (D.E. 66, 69). On July 11, 2019, Defendant Black-Edwards filed a Motion to Dismiss. (D.E. 78). Plaintiff filed numerous responses and supplemental

responses to the pending motions to dismiss. (D.E. 53, 62, 73, 103, 104, 105, 106, 107, 108, 109). Plaintiff also filed two Motions for Leave to File a Second Amended Complaint. (D.E. 93, 94). Plaintiff sought leave to file these motions to amend in part to cure some of the deficiencies outlined in the Defendants' motions to dismiss.

On January 2, 2020, the undersigned entered an Order granting Plaintiff's motions to amend and directing Plaintiff to file a Comprehensive Second Amended Complaint[4] against Defendants McCoy, Hancock, Khan, Abbott, Linthicum, and Black-Edwards (collectively referred to herein as "Defendants"). (D.E. 110, p. 5). The undersigned further denied Defendants' various motions to dismiss without prejudice until after Plaintiff submitted his Comprehensive Second Amended Complaint. (D.E. 110, p. 6). Lastly, the undersigned denied Plaintiff's motions for declaratory and other forms of relief as premature and unnecessary. (D.E. 110, p. 7).

On January 14, 2020, Plaintiff filed his Comprehensive Second Amended Complaint. (D.E. 112, 113). Plaintiff seeks to sue Defendants Hancock, McCoy, Abbott, and Black-Edwards in their individual capacities only and Defendants Linthicum and Khan in both their individual and official capacities. (D.E. 113, pp. 2-5). Plaintiff stated in his Comprehensive Second Amended Complaint that: (1) Defendants Hancock and McCoy are nurse practitioners (NP);[5] (2) Defendants Kahn and Linthicum are doctors; and (3) Defendants Abbott and Black-Edwards are registered nurses (RN). (D.E. 113, pp.

---

[4] The undersigned instructed that Plaintiff's Comprehensive Second Amended Complaint would be, once filed, the operative pleading in this case as all previous complaints and amended complaints would then be disregarded. (D.E. 110, p. 6).

[5] Defendant McCoy has been identified in the record as a Physician Assistant (PA). (*See* D.E. 182-1, p. 16).

2-5). Plaintiff seeks declaratory, injunctive, and monetary relief. (D.E. 113-3, pp. 6-12). On the issue of injunctive relief, Plaintiff's allegations reflect that both Dr. Kahn and Dr. Linthicum have the authority to approve or deny treatment to Plaintiff in connection with his Hepatitis C condition.

On February 7, 2020, Defendants McCoy, Hancock and Khan filed a Second Motion to Dismiss. (D.E. 116). That same day, Defendants Black and Linthicum subsequently filed their Second Motion to Dismiss. (D.E. 118). Defendant Abbott filed his Second Motion to Dismiss as well. (D.E. 119). Plaintiff filed a response to each motion to dismiss as well as several declarations. (D.E. 121, 122, 123, 125, 126, 127).

On May 11, 2020, the undersigned issued a Memorandum and Recommendation (May 11, 2020 M&R), recommending that: (1) the second motions to dismiss filed by Defendants McCoy, Hancock, Khan, Black, and Linthicum be granted to the extent that Plaintiff's claims for money damages against them in their official capacities be dismissed with prejudice; (2) the second motions to dismiss filed by Defendants McCoy, Hancock, Khan, Black, and Linthicum be denied in all other respects; and (3) Defendant Abbott's Second Motion to Dismiss be denied in all respects. (D.E. 130). The undersigned further recommended that, for purposes of screening Plaintiff's Second Comprehensive Amended Complaint, Plaintiff's claims seeking declaratory and injunctive relief against Defendants Kahn and Linthicum in their official capacities be retained. (D.E. 130). Defendants subsequently filed their answers. (D.E. 135, 136, 137). On August 11, 2020, Judge Tagle adopted the May 11, 2020 M&R. (D.E. 148).

Plaintiff has filed a Motion for Preliminary Injunction. (D.E. 156). On December 1, 2020, Defendants Black and Linthicum filed a Motion for Summary Judgment. (D.E. 178). On December 8, 2020, Defendants Abbott, Hancock, Khan, and McCoy filed a Motion for Summary Judgment. (D.E. 182). Starting on January 13, 2021, the Court received from Plaintiff several Motions for Summary Judgment and responses to Defendants' summary judgment motions. (D.E. 184, 185, 186, 193, 194).

On February 16, 2021, Defendants Black and Linthicum filed a Motion to Strike Plaintiff's Motion for Summary Judgment and their response to the summary judgment motions. (D.E. 202). Plaintiff subsequently filed his responses to the Motion to Strike. (D.E. 205, 206, 207). Plaintiff has also filed a Motion to Show Cause for Excusable Neglect in Response to the Motion to Strike. (D.E. 208).

Court records reflect that Plaintiff has filed numerous materials in this case in support of his summary judgment motions and in response to Defendants' summary judgment motions. (D.E. 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 210, 211, 212, 213, 214, 215, 216, 217, 222). On March 31, 2021, Defendants filed an Advisory Concerning Supplemental Authority. (D.E. 218). Plaintiff field several responses to Defendants' Advisory. (D.E. 219, 220, 221, 223, 225, 226). Lastly, on May 24, 2021, Plaintiff filed a Motion for Obstruction of Justice against Defendants. (D.E. 224).

## III.    MOTION TO STRIKE

On July 1, 2020, the undersigned issued a Scheduling Order in this case setting forth that: (1) dispositive motions shall be filed on or before December 1, 2020; and (2)

responses to dispositive motions are due thirty days after the filing of the opposing parties dispositive motions. (D.E. 143). The undersigned extended the dispositive motions deadline to on or before December 8, 2020. (D.E. 176). Defendants timely filed their summary judgment motions on December 1, 2021 and December 8, 2021, respectively. (D.E. 178, 182).

In their Motion to Strike, Defendants Black-Edwards and Linthicum contend that Plaintiff's summary judgment motions filed against them were untimely filed after the dispositive motions deadline had expired. (D.E. 202, pp. 2-10). Court records reflect that Plaintiff's summary judgment motion filed against Defendants Black-Edwards and Linthicum was received by the Court on January 15, 2021. (D.E. 185). Plaintiff declares that he served a copy of this summary judgment motion on Defendants Black-Edwards and Linthicum by placing it in the McConnell Unit mailing system on January 11, 2021. (D.E. 185, p. 62).

In his various responses to the Motion to Strike, Plaintiff states his belief that the Court's Scheduling Order setting forth the discovery motions deadline only applied to Defendants. (D.E. 205, p. 7). Plaintiff also contends that, due to the complexity of the case and the amount of materials attached to Defendants' summary judgment motions, he did not know he had only thirty days to file his responses or that he was required to seek leave before finding a late response. (D.E. 205, pp. 7-9; D.E. 207, pp. 2-3). Plaintiff also reiterates many of these arguments in his Motion to Show Cause of Excusable Neglect. (D.E. 208). He contends he failed to include proper postage on many of the envelopes containing his legal materials that were mailed to this Court. (D.E. 209).

While the pleadings of *pro se* litigants must be construed liberally and reviewed less stringently than those drafted by attorneys, *pro se* parties must still comply with the rules of procedure. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007). *See also Hulsey v. Tex.,* 929 F.2d 168, 171 (5th Cir. 1991) (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law.")).

Plaintiff's first summary judgment motion against Defendants Black-Edwards and Linthicum was untimely filed after the expiration of the dispositive motions deadline set for December 8, 2020. The Court's orders setting forth the dispositive motions deadline gave Plaintiff fair notice of the filing deadline. *See Turner v. Cain*, No. 12-598, 2018 WL 3978368, at *2 (M.D. La. Aug. 20, 2018) (concluding that summary judgment motion filed by *pro se* plaintiff was untimely filed after the dispositive motions deadline had expired). Plaintiff has failed to show good cause to excuse the late filing of his summary judgment motion against Defendants Black-Edwards and Linthicum. Plaintiff's first summary judgment motion was placed in the mail well after December 8, 2020. His second supplemental summary judgment motion, dated January 15, 2020, is likewise untimely. Accordingly, the undersigned respectfully recommends that Defendants Black-Edwards's and Linthicum's Motion to Strike (D.E. 202) be granted, that the Court strike Plaintiff's summary judgment motions (D.E. 185, 193) filed against them, and that Plaintiff's Motion to Show Cause of Excusable Neglect (D.E. 208) be denied.

The undersigned further notes that Plaintiff's first summary judgment motion filed against Defendants Abbott, Hancock, Khan, and McCoy was received by the Court on

January 13, 2021. (D.E. 184). Plaintiff declares that he served a copy of this summary judgment motion on these four defendants by placing it in the McConnell Unit mailing system on December 28, 2020. (D.E. 184, p. 62).

Even assuming under the prison mailbox rule that Plaintiff filed this summary judgment motion against Defendants on December 28, 2020, it also was filed in an untimely fashion after the expiration of the dispositive motions deadline. In his Motion to Show Cause of Excusable Neglect, Plaintiff attempts to address the filing of his summary judgment motion against Defendants Abbott, Hancock, Khan, and McCoy by citing the fact his motion was returned for insufficient postage. (D.E. 208, pp. 5-6). However, he provides no credible reason to excuse the fact that he initially moved for summary judgment after the dispositive motions deadline had expired. Accordingly, the undersigned respectfully recommends that the Court strike Plaintiff's summary judgment motion (D.E. 184) filed against Defendants Abbott, Hancock, Khan, and McCoy as untimely filed.

As noted above, the undersigned's Scheduling Order required responses to dispositive motions to be filed thirty days after the filing of the opposing parties' dispositive motions. (D.E. 143). Plaintiff has filed numerous responses and exhibits to Defendants' summary judgment motions filed on December 1, 2020, and December 8, 2020, respectively. Plaintiff has provided declarations indicating that several exhibits were placed into the prison's mailing system on December 28, 2020, well within the thirty day period. (D.E. 188, 189, 190, 191, 192). In addition, on December 28, 2020, Plaintiff placed into the McConnell Unit mailing system a copy of his 67-page response

and attached exhibits to the summary judgment motion filed by Defendants Abbott, Hancock, Khan, and McCoy.[6] (D.E. 184, p. 62). The undersigned, therefore, finds these filings to be timely responses to Defendants' summary judgment motion.

On January 11, 2021, Plaintiff also placed into the McConnell Unit's prison mailing system a lengthy 86-page response to the summary judgment motion filed by Defendants Edwards-Black and Linthicum. (D.E. 186). While this response was submitted to the Court a few days after the expiration of the 30-day response period, the undersigned nevertheless finds it reasonable and appropriate to consider same as it constitutes his initial and comprehensive response to the summary judgment motion.

Plaintiff, however, has submitted numerous additional exhibits and supplemental responses to Defendants' summary judgment motion after the expiration of the 30-day response period. He has not moved the Court for permission to file any of these additional late responses. A review of these late responses reveals that Plaintiff: (1) attempts to reargue many of the same points already set forth in his lengthy response briefs (D.E. 193, 194, 201, 219) ; (2) seeks to submit evidentiary materials that have already been submitted to the Court (D.E. 195, 196, 197, 198, 199, 200); and (3) attempts to submit Defendants' various responses to his discovery requests without any context or explanation as to their relevance to his arguments (D.E. 210, 211, 212, 213, 214, 215, 216, 217). The undersigned respectfully recommends, therefore, that the Court strike all of these late filings.

---

[6] Plaintiff's response to the summary judgment motion filed by Defendants Abbott, Hancock, Kahn, and McCoy is contained in the same document as his untimely summary judgment motion filed against them. The undersigned nevertheless will consider all of the arguments urged by Plaintiff in this document as his response to the summary judgment filed by these defendants.

On March 31, 2021, Defendants submitted an Advisory concerning supplemental authority. (D.E. 218). Defendants' Advisory is unnecessary as the Court is quite able to research the relevant caselaw on its own. To the extent that Defendants' Advisory may be construed as presenting additional arguments in support of their summary judgment motions, the undersigned respectfully recommends that the Court strike the advisory because Defendants did not seek Court permission to submit additional arguments. It is respectfully recommended further that the Court likewise strike Plaintiff's responses to the advisory (D.E. 219, 220, 221, 223, 225, 226) as impermissible attempts to file additional responses in an untimely manner without seeking Court leave.

On July 8, 2021, this Court received Plaintiff's motion requesting that his summary judgment motions and responses be liberally construed as well as an additional response to Defendants' summary judgment motions. (D.E. 227). Plaintiff once again seeks to submit additional arguments in an untimely fashion without seeking appropriate leave. Furthermore, the arguments advanced in this motion rehash arguments already advanced in his timely responses. Accordingly, the undersigned respectfully recommends that the Court strike Plaintiff's motion (D.E. 227) as an impermissible attempt to file an additional response in an untimely manner without seeking Court leave.

In sum, the undersigned will consider the following materials submitted by Plaintiff as his responses to Defendants' summary judgment motion: (1) Plaintiff's 67-page response and attached exhibits to the summary judgment motion filed by Defendants Abbott, Hancock, Khan, and McCoy (D.E. 184); (2) Plaintiff's 86-page response to the summary judgment motion filed by Defendants Edwards-Black and

Linthicum (D.E. 186); and (3) Plaintiff's exhibits timely filed within thirty days of the summary judgment motions submitted by Defendants (D.E. 188, 189, 190, 191, 192).

Defendants Black-Edwards and Linthicum object to the length of Plaintiff's 86-page brief as outside the 25-page limit set forth by the Court. (D.E. 202, p. 3). The undersigned finds that, while Plaintiff could have presented his arguments in a more concise manner, the extended lengths of both his response briefs (D.E. 184, 186) are permissible given the complexity of the factual and legal issues presented in this case. These lengthy briefs more than sufficiently set forth Plaintiff's response to the issues in this case, lending further reason for the Court to strike the unnecessary and late filings submitted by Plaintiff noted above.

## IV.    SUMMARY JUDGMENT EVIDENCE

Defendants Black-Edwards and Linthicum offer the following summary judgment evidence:

Exh. A:    Plaintiff's Relevant Medical Records (D.E. 178-1).

Exh. B:    Correctional Managed Health Care Committee (CMHCC) Hepatitis C policies in effect from April 14, 2016 to November 19, 2018 (Hepatitis C Policy) (D.E. 178-2).

Exh. C:    Affidavit of Dr. Shehzed Merwat (D.E. 178-3).

Defendants Abbott, Hancock, Kahn, and McCoy offer the following summary judgment evidence:

Exh. A:    Affidavit of Dr. Merwat, along with attached relevant medical records regarding Plaintiff (D.E. 182- 1 through 182-6).

Exh. B:  Plaintiff's Relevant TDCJ Medical Records (D.E. 182-7 through 182-12).

Plaintiff, in turn, has offered the following summary judgment evidence: (1) his relevant medical records (D.E. 184-1; D.E. 188-1; D.E. 189-1; D.E. 190-1; D.E. 191-1, pp. 1-6, 31-46; D.E. 192-1); (2) Beeville County Boil Water notices (D.E. 191-1, pp. 7-12, 15-17); (3) Plaintiff's informal and formal grievances (D.E. 191-1, pp. 13-14, 18-30); (4) Plaintiff's verified amended complaint and attachments thereto (D.E. 112, 113); and (15) Plaintiff's testimony at the *Spears* hearing (D.E. 27).

The parties have presented the following undisputed summary judgment evidence: The TDCJ's Hepatitis C Policy is set forth in the CMHCC Infection Control Manual as Policy B-14.13-3.  (See D.E. 178-2).  Dr. Merwat, the Medical Director of Liver Transplantation and the United Network of Organ Transplantation (UNOC), attested in his affidavit that he is familiar with the national standards of care  for patients with Hepatitis C as set forth by the by the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA).  (D.E. 182-1, p. 3).

The Hepatitis C policies are reviewed, approved, and revised annually by the CMHCC in coordination with the joint medical directors.  (D.E. 182-1, p. 11).  The committee and joint medical directors are comprised of various health care professionals affiliated with the UTMB, TDCJ, and the Texas Tech University Health Sciences Center (TTUHSC).  (D.E. 182-1, p. 11).

Dr. Kahn is the UTMB/CMC Medical Director of Clinical Virology. (D.E. 182-1, p. 17). Dr. Kahn provides her expertise to multiple committees, such as the CMHCC Infection Control Committee and the CMHCC Pharmacy and Therapeutics Committee, as well as those individuals involved in the development, review, and approval of the Hepatitis C Policy. (D.E. 182-1, p. 17). Dr. Linthicum, RN Black-Edwards, and RN Abbott participate in the committees responsible for developing and approving the Hepatitis C Policy contained in Policy B-14.13-3. (D.E. 182-1, p. 18).

The Hepatitis C Policy generally provides that "the screening, testing, baseline evaluation, and annual evaluations in chronic care clinic are performed by unit level medical providers" and that the unit provider is authorized to determine whether a patient is a candidate for referral to the UTMB/CMC HCV[7] Clinic for prioritization, monitoring, and treatment." (D.E. 182-1, p. 12). The Hepatitis C Policy, in compliance with AASLD/IDSA guidelines where resources are limited, "prioritize[s] treatment of patients whose liver status reflects advanced fibrosis or cirrhosis ahead of those [patients] with little to no structural evidence of advanced fibrosis or cirrhosis as the former are at a higher risk of hepatocellular carcinoma (HCC)." (D.E. 182-1, p. 11).

Dr. Merwat stated that in his affidavit that:

Accurate fibrosis assessment is needed for patient prioritization. Fibrosis is the medical term to describe the formation of scarring. In the setting of chronic HCV infection, scarring occurs in the liver in response to damage to the hepatocytes (or liver cells) and generally takes decades to develop. Accelerated progression over many years (as opposed to several decades) usually requires the presence of additional risk factors that can include HIV

---

[7] HCV stands for Hepatitis C Virus.

co-infection, obesity/metabolic syndrome with subsequent non-alcoholic fatty liver disease, and alcohol use disorder among other conditions.

(D.E. 182-1, pp. 8-9). Dr. Merwat describes the condition of cirrhosis as occurring where the assessment of the scar tissue has created nodules in the liver. (D.E. 182-1, p. 7). Liver disease becomes clinically more significant when it progresses to the point that cirrhosis becomes "decompensated," which increases the risk for morbidity and mortality. (D.E. 182-1, p. 7).

Rather than solely recommend a liver biopsy to establish the degree of fibrosis, the AASLD/IDSA also recommends the use of noninvasive tests for evaluating advanced fibrosis. (D.E. 182-1, p. 9). One such non-invasive test is called the Aspartate Aminotransferase (AST) to platelet ration index (APRI) which, while not as accurate as a liver biopsy, is non-invasive, easily obtained, cost efficient, and is not risky for the patient. (D.E. 182-1, pp. 9-10). The APRI is used to determine the likelihood of fibrosis and/or cirrhosis in patients with Hepatitis C. (D.E. 182-1, p. 10).

Starting in 2015, Hepatitis C patients with scores greater than 0.7 were eligible for referral to either UTMB or the TTUHSC for treatment assessments. (D.E. 182-1, p. 10). The Hepatitis C Policy, effective April 14, 2016, specifically provided that inmates with Hepatitis C infection must be enrolled in the Chronic Care Clinic and seen at least once every 12 months. (D.E. 178-2, p. 4). Under the Hepatitis C Policy, effective April 14, 2016, patients with APRI scores less than or equal to 0.7 generally did not require evaluation for possible treatment. (D.E. 178-2, p. 5). Referrals and evaluation for treatment were nevertheless possible based on certain clinical considerations, including:

(1) the Hepatitis C infection was acquired many years previously; (2) clinical or laboratory evidence of a failing liver; and (3) co-morbid conditions that might result in an unreliable APRI score. (D.E. 178-2, p. 5).

Dr. Merwat stated in his affidavit that CMHCC was aware of the advanced DAA therapies and their efficacy levels in 2016 and revised the Hepatitis C Policy at that time to incorporate the use of DAAs sofosbuvir and other DAA combinations. (D.E. 182-1, p. 6). These DAA therapies were expensive, costing $84,000 for a twelve-week course when they were first brought to market. (D.E. 182-1, p. 7)

The Hepatitis C Policy was revised on April 3, 2017. (D.E. 178-2, pp. 14-22). The policy, as revised, again required inmates with Hepatitis C infection to be enrolled in the Chronic Care Clinic and seen at least once every 12 months. (D.E. 178-2, p. 16). The policy maintained the general requirement that patients with APRI scores less than or equal to 0.7, absent considerations discussed above, did not require evaluation for possible treatment. (D.E. 178-2, p. 17).

The Hepatitis C Policy was revised in May 2018 and April 2019. (D.E. 178-2, pp. 26-34; D.E. 182-1, p. 11). The policy, as revised on these two occasions, again required inmates with Hepatitis C infection to be enrolled in the Chronic Care Clinic and seen at least once every 12 months. (D.E. 178-2, p. 28). The policy set forth the revised requirement that patients with APRI scores less than or equal to 0.5, absent considerations discussed above, did not require evaluation for possible treatment. (D.E. 178-2, p. 29; D.E. 182-1, p. 11). The Hepatitis C Policy, effective May 2018 and April 2019, provided that offenders with an APRI score over 0.5 should be referred to a

designated HCV clinic for possible treatment but that the decision must be individualized. (D.E. 178-2, p. 29). The medical provider retains discretion in his clinical judgment whether a patient with an APRI lower than 0.5 should be referred for possible treatment. (D.E. 178-2, p. 29).

The date Plaintiff contracted the Hepatitis C infection is unknown. Plaintiff was first referred to the UTMB Hepatitis C specialty clinic in 2014. (D.E. 178-1, p. 2-5). Plaintiff's Hepatitis C condition has been monitored by McConnell Unit and UTMB medical officials on numerous occasions since 2014. (D.E. 178-1; D.E. 182-1, pp. 13-14).

When Plaintiff was tested at various times from 2016 through 2020, his APRI score was as follows: (1) April 14, 2016 - APRI = 0.56; (2) July 22, 2016 - APRI = 0.68; (3) February 21, 2017 - APRI = 0.53; (4) July 20, 2017 - APRI = 0.47; (5) February 4, 2017 - APRI = 0.28; (6) March 29, 2018 - APRI = 0.55; and (7) June 7, 2018 - APRI = 0.905. (D.E. 182-1, p. 14; D.E. 182-3, p. 83). (D.E. 59-2, p. 169). Plaintiff's AFP (alpha fetoprotein) levels were further tested during his time in TDCJ custody. Dr. Merwat stated in his affidavit that:

> AFP … is a marker of hepatocyte cell turnover and is often elevated in patients with chronic HCV infection. In a certain percentage of patients with HCC (Liver Cancer), this may be elevated as well. [Plaintiff's] AFP level ranged from 8.7 – 13.5 ng/mL. AFP elevation secondary to HCC are usually much higher than this value with multiple imaging studies. These imaging studies do not show the presence of liver cancer. In addition, AFP elevation and enzymes elevations are not markers of measurable fibrosis progression or stage.

(D.E. 182-1, p. 19).

NP Hancock was employed by UTMB/CMC as a Hepatitis C Clinic provider, and she provided care to Plaintiff in the HCV Clinic from October 16, 2014 to March 30, 2017. (D.E. 182-1, p. 15). On November 9, 2015, NP Hancock met with Plaintiff in the HCV clinic to discuss the status of his liver condition and options for treatment. (D.E. 182-1, p. 15; D.E. 182-3, pp. 86-87).

NP Hancock subsequently met with Plaintiff in late March or early April of 2016, where Plaintiff agreed to have an ultrasound performed on his liver. (D.E. 182-1, p. 15). On December 14, 2016, Plaintiff met with Plaintiff and ordered an ultrasound to be performed on Plaintiff. (D.E. 182-1, p. 15; D.E. 182-4, p. 11). NP Hancock last met with Plaintiff on March 30, 2017 where she recommended that Plaintiff "speak to mental health" since he reported being depressed. (D.E. 182-1, p. 15; D.E. 182-4, p. 16).

PA McCoy was employed by UTMB/CMC as a Hepatitis C Clinic provider, who assumed care of Plaintiff for his Hepatitis C infection in November of 2017. (D.E. 182-1, p. 16). On that day, PA McCoy discussed the results of Plaintiff's lab results with him. (D.E. 182-1, p. 16; D.E. 182-4, p. 20). Plaintiff agreed to a unit transfer for HCV treatment when space became available. (D.E. 182-1, p. 16; D.E. 182-4, p. 20). During Plaintiff's second visit with PA McCoy on May 4, 2018, Plaintiff agreed to have an ultrasound performed on him. (D.E. 182-1, p. 16; D.E. 182-4, p. 24).

On August 13, 2018, a few weeks after Plaintiff received his APRI score of 0.905, PA McCoy met with Plaintiff and recommended that Plaintiff change his anti-seizure medication so that Plaintiff could be seizure free before starting on DAA therapy. (D.E. 182-1, p. 16; D.E. 182-4, p. 30). PA McCoy then ordered routine tests for Plaintiff and

forwarded Plaintiff's medical records to the Medical Director of Virology for review. (D.E. 182-1, p. 16; D.E. 182-4, p. 31). On November 9, 2018, PA McCoy met with Plaintiff who denied seizure activity since the medication change and agreed to monitoring for disease progression in accordance with HCV protocol and a transfer to the Center of Excellence while on DAA therapy. (D.E. 182-1, pp. 16-17, D.E. 182-4, p. 36).

On November 13, 2018, Dr. Kahn participated in reviewing Plaintiff's medical chart and approving him for DAA treatment with the drug Epclusa to begin on November 19, 2018. (D.E. 182-1, p. 17; D.E. 182-5, pp. 2-3). Plaintiff completed his Epclusa treatment on February 10, 2019. (D.E. 182-5, p. 5). Plaintiff subsequently tested negative for the HCV virus in March 2019. (D.E. 178-1, p. 58; D.E. 182-1, p. 17; D.E. 182-5, p. 5).

From 2015 to 2020, Plaintiff had multiple imaging studies of his liver to determine any evidence of decompensated cirrhosis or liver cancer. (D.E. 182-1, p. 19). On May 29, 2015, an ultrasound was taken of Plaintiff's liver with the following findings:

> The liver is slightly enlarged with mildly increased echogenicity and mildly coarse echotexture, but with normal contours. The liver measures 17 cm. No intrahepatic biliary dilatation is present. The main portal vein demonstrates normal hepatopetal flow.

(D.E. 182-5, p. 18). The reviewing medical provider concluded that Plaintiff's liver had "[m]ild hepatomegaly with a mildly coarsened echotexture." (D.E. 182-5, p. 18).

On July 26, 2016, an ultrasound was taken of Plaintiff's liver with the following findings:

The liver is normal in size (16 cm) and exhibits increased parenchymal echogenicity and coarsening without mass or focal lesion. The main portal vein is patent with hepatopetal flow on color Doppler and spectral waveforms.

(D.E. 182-5, p. 20). The reviewing medical provider concluded that Plaintiff's liver had "[h]epatic steatosis with parenchymal coarsening, without overt mass or lesion." (D.E. 182-5, p. 20).

On March 7, 2017, an ultrasound was taken of Plaintiff's liver in order to rule out any signs of cirrhosis and HCC. (D.E. 182-5, p. 22). The ultrasound revealed that:

The liver is normal in size, contour, and echogenicity. The liver measures 17.3 cm. No sonographically detectible focal lesions are identified within the liver. No intrahepatic biliary dilatation is present. The main portal vein demonstrates normal hepatopetal flow.

(D.E. 182-5, p. 22). The reviewing medical provider concluded that Plaintiff's liver had "[m]ild hepatomegaly without a focal hepatic lesion." (D.E. 182-5, p. 22).

On May 22, 2018, an ultrasound taken of Plaintiff's liver revealed that the liver was:

Normal in size with mildly coarsened echotexture and questionable a [sic] nodular contour. No focal hepatic lesion. Normal hepatopetal flow within the main portal vein.

(D.E. 182-5, p. 22). The reviewing medical provider concluded that Plaintiff had "[c]hronic parenchymal liver disease with possible early cirrhosis" and "[n]o focal hepatic lesions." (D.E. 182-5, p. 24).

On February 12, 2019, an ultrasound taken of Plaintiff's liver revealed that the liver was:

> Normal in size with coarse echotexture. No focal hepatic lesion. Normal
> hepatopetal flow within the main portal vein.

(D.E. 182-5, p. 24). The reviewing medical provider concluded that Plaintiff had "[c]hronic parenchymal liver disease without focal lesions." (D.E. 182-5, p. 24).

On March 7, 2019, a CT Scan of Plaintiff's abdomen and pelvis was taken with and without contrast. (D.E. 182-5, pp. 29-30; D.E. 184-1, pp. 18-19). Dr. Merwat described this CT Scan as "one of the most sensitive and specific modalities to detect HCC currently available." (D.E. 182-1, p. 20). UTMB Health's clinical report associated with the March 7, 2019 CT Scan was twelve pages. (D.E. 184-1, pp. 22). In various sections listed as "Final Diagnoses" or "Diagnoses," the clinical report reflects Plaintiff's diagnoses as liver cell carcinoma or HCC, which is liver cancer. (D.E. 184-1, pp. 13, 16, 21, 22).

The March 7, 2019 CT Scan's preliminary findings revealed that Plaintiff's liver was:

> [E]nlarged measuring 18 cm craniocaudally with normal contour.
> Subcentimeter lesion in the liver segment 6 which is hypodense in all of the
> phases (8:29), too small to characterize; however, statistically may
> represent hepatic cysts. Subcentimeter lesion measuring 4mm with faint
> arterial enhancement in the liver segment 6 (7:32) with no delayed phase
> washout, representing LR3 lesion.

((D.E. 184-1, p. 19). The reviewing medical provider concluded in her preliminary findings that Plaintiff's liver had an LR3 lesion as well as hepatic cysts. (D.E. 184-1, p. 19). The CT Scan's final findings revealed, however, that Plaintiff's liver was:

> [E]nlarged measuring 18 cm craniocaudally with mildly lobulated contour. Subcentimeter lesion in the liver segment 6 which is hypodense in all of the phases (8:29), consistent with a cyst. No lesion with arterial enhancement and washout.

(D.E. 182-5, p. 30; D.E. 184-1, p. 18). The reviewing medical provider concluded in her final findings, as opposed to the preliminary findings, that there was no arterially enhancing lesion in Plaintiff's liver to suggest the presence of HCC. (D.E. 182-5, p. 30; D.E. 184-1, p. 19).

On June 21, 2019, NP McCoy met with Plaintiff, who insisted that UTMB had diagnosed him with HCC. (D.E. 182-5, p. 5). NP McCoy reviewed the March 7, 2019, CT Scan, and informed Plaintiff that the results did not indicate HCC. (D.E. 182-5, p. 5). NP McCoy further noted that Plaintiff's Hepatitis C infection remained nondetectable. (D.E. 182-5, p. 5). Lastly, NP McCoy ordered an ultrasound for Plaintiff to take place on September 3, 2019 and reiterated the plan to image Plaintiff's liver through an ultrasound or CT Scan every six months for "HCC surveillance." (D.E. 182-5, pp. 5-6).

On September 3, 2019, an ultrasound revealed that the liver was:

> [C]oarsened in echotexture with lobular in contour. No focal lesion is detected. Portal vein: Hepatopetal flow present in the main portal vein.

(D.E. 182-5, p. 27). The reviewing medical provider concluded that Plaintiff's "[c]oarsened liver suggests chronic liver disease" with no "focal hepatic lesions." (D.E. 182-5, pp. 27-28).

On March 18, 2020, a CT Scan of Plaintiff's abdomen and pelvis was taken with and without contrast. (D.E. 182-5, pp. 31-32). The March 18, 2020 CT Scan's final findings revealed that Plaintiff's liver:

> [M]easures nearly 18 cm in craniocaudal dimension with left hepatic lobe. Unchanged subcentimeter hypodensity in segment 6 on 8:32 is too small to characterize. No arterially enhancing lesions with washout or pseudocapsule are identified.

(D.E. 182-5, p. 31). The reviewing medical provider concluded in the final findings that there was no arterially enhancing hepatic lesions and no evidence of HCC. (D.E. 182-5, p. 32).

## V.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, affidavits or declarations "must be

made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law. *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct. *Bazan v. Hidalgo County*, 46 F.3d 481, 490 (5th Cir. 2001).

VI.     **DISCUSSION**

    A.     **Deliberate Indifference**

       *(1)  General Legal Principles*

Plaintiff claims that Defendants have acted with deliberate indifference to his serious medical needs by failing to treat his chronic Hepatitis C and cirrhosis conditions in a timely and effective manner. Prisoners are protected from cruel and unusual punishment by the Eighth Amendment. While not mandating a certain level of medical care for prisoners, the Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Prison officials are liable for failure to provide medical treatment if they are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). Deliberate indifference may be exhibited by prison doctors in their response to prisoners' needs, but it may also be shown when prison officials have denied an inmate prescribed treatment or have denied him access to medical personnel capable

of evaluating the need for treatment.  *Id.* at 104-05.  A prison official acts with deliberate indifference if she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. 825, 847 (1994).  The official must both be aware of facts from which an inference of substantial risk of serious harm can be drawn and also draw the inference.  *Easter*, 467 F.3d at 463.  A prison official's knowledge of substantial risk may be inferred if the risk was obvious.  *Id.*

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted).  Delay in treatment may be actionable under § 1983 only if there has been deliberate indifference and the delay results in substantial harm.  *Stewart v. Murphy,* 174 F.3d 530, 537 (5th Cir.1999); *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir. 1993).

Although inadequate medical treatment may rise to the level of a constitutional violation, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances."  *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012).  Deliberate indifference encompasses only unnecessary and wanton

inflction of pain repugnant to the conscience of mankind. *McCormick v. Stalder*, 105

F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

### *(2) The Parties' Contentions*

Defendants Abbott, Hancock, Khan, and McCoy contend in their summary

judgment motion that Plaintiff has failed to demonstrate that they acted with deliberate

indifference to Plaintiff's serious medical needs. (D.E. 182, pp. 14-16). They argue that

Plaintiff's claims amount to a disagreement with his treatment plan and that any claims of

deliberate indifference are not supported by the evidence. (D.E. 182, p. 16). These

defendants further argue that Plaintiff's deliberate indifference claims against RN Abbott

should be dismissed due to his lack of personal involvement with respect to the approval,

adoption, and implementation of the Hepatitis C policies. (D.E. 182, pp. 11-14).

Defendants Linthicum and Black-Edwards contend in their summary judgment

motion that Plaintiff has failed to demonstrate they implemented unconstitutional policies

in violation of the Eighth Amendment. (D.E. 178, pp. 8-12). They further contend that

controlling authority in the Fifth Circuit has upheld the Hepatitis C policies at issue in

this case which allows for monitoring and prioritizing the more serious Hepatitis C

patients as opposed to treating immediately with DAA medications. (D.E. 178, p. 11).

In response to the summary judgment filed by Defendants, Plaintiff contends that

each defendant acted with deliberate indifference to his serious medical needs as follows:

(1) Defendants' application of the protocols written into the applicable
    Hepatitis C Policy fell below the acceptable standard of care;

(2) NP Hancock failed to refer Plaintiff for immediate DAA treatment
    even though she knew that Plaintiff's liver enzyme levels were high

and that Plaintiff's ultrasounds results showed serious liver disease;

(3) PA McCoy failed to refer Plaintiff for immediate DAA treatment even though he knew that Plaintiff's liver enzyme levels were high, that Plaintiff's liver disease was progressing, and that Plaintiff had been diagnosed with HCC or liver cancer on March 7, 2019;

(4)     Dr. Kahn failed to providing Plaintiff with proper medical treatment even though she knew he had been diagnosed with HCC following the March 7, 2019 CT Scan;

(5)     RN Abbott personally participated in the protocols under the Hepatitis C policies which allowed for Plaintiff to continue with monitoring instead of immediate treatment under the Hepatitis C policies until developing serious liver disease.

(6)     Dr. Linthicum and RN Black-Edwards approved and personally participated in implementing protocols under the Hepatitis C policies that were out of date and fell below constitutionally acceptable standards of care by unnecessarily delaying DAA treatment until Plaintiff's liver disease had progressed to a serious level.

(D.E. 184, pp. 2-15; D.E. 186, pp. 3-4, 49). Plaintiff contends that following Plaintiff's diagnosis of possible early cirrhosis on May 22, 2018 and APRI score of over 0.9 on June 7, 2018, Defendants participated in adopting and/or choosing course of monitoring Plaintiff's Hepatitis C condition even though he met the criteria for immediate DAA treatment under the Hepatitis C policies. (D.E. 84, pp. 56-57; D.E. 186, pp. 3, 13-14).

### *(3) Analysis of Plaintiff's Deliberate Indifference Claims*

In support of their summary judgment motions, Defendants have offered extensive evidence that they did not wantonly disregard Plaintiff's Hepatitis C infection and related health issues so as to violate the Eighth Amendment. The uncontroverted summary

judgment evidence establishes that: (1) the Hepatitis C Policy was established under the guidelines set forth by the AASLD and the IDSA (D.E. 182-1, pp. 3, 6-7); (2) in compliance with AASLD/IDSA guidelines where resources are limited, the Hepatitis C Policy provides for monitoring of inmates with the Hepatitis C infections and prioritizes the treatment of those inmates with advanced fibrosis or cirrhosis before patients ahead of inmates with little to no structural evidence of advanced fibrosis or cirrhosis (D.E. 182-1, pp. 8-11); and (3) the Hepatitis C Policy has been revised as updated as new information became available, including the revision in May 2018 to lower the APRI score threshold for likely treatment from 0.7 to 0.5 (D.E. 178-2, pp. 17, 29; D.E. 182-1, p. 11).

Plaintiff has offered no evidence to establish that the Hepatitis C Policy developed, adopted, and implemented by the appropriate committees and medical officials were constitutionally deficient or that a universal consensus of medical opinion otherwise existed to reject the monitoring and prioritization practices employed in the Texas prison system under the Hepatitis C Policy. *See Gibson v. Collier*, 920 F.3d 212, 220-21 (5th Cir. 2019) (rejecting a claim of deliberate indifference where the inmate could not show a "consensus in the medical community" about a particular course of treatment); *Davidson v. Tex. Dep't of Criminal Justice, Inst. Div.*, 91 F. App'x 963, 965 (5th Cir. 2004) (finding that denial of interferon therapy for Hepatitis C was done in compliance with generally accepted medical standards and did not constitute deliberate indifference). Plaintiff, therefore, cannot establish that Defendants Abbott, Linthicum, and Black-Edwards, to the extent they participated in developing, adopting, and

implementing the Hepatitis C Policy, acted with deliberate indifference to Plaintiff's serious medical needs.

Plaintiff's medical records show that, pursuant to the Hepatitis C Policy, Plaintiff's Hepatitis C condition was regularly tested and monitored since he was first referred to the UTMB Hepatitis C specialty clinic in 2014.  (D.E. 178-1, D.E. 182-1, pp. 13-14).  The uncontroverted summary judgment evidence further shows that Defendants Hancock, McCoy, and Kahn (as well as other medical officials) adhered to the Hepatitis C Policy in effect by: (1) evaluating and monitoring Plaintiff's Hepatitis C condition on at least an annual basis in the Hepatitis C clinic during this time in TDCJ custody; and (2) ordering laboratory work, testing Plaintiff's APRI score on a number of occasions to determine the condition of Plaintiff's liver, and ordering Plaintiff's liver to be imaged by ultrasound or CT  Scan.  (D.E. 182-1, pp. 15-17; D.E. 182-3, pp. 86-87; D.E. 182-4, pp. 11, 16, 20, 24, 31, 36; D.E. 182-5, pp. 2-3, 5).

The objective medical records specifically demonstrate that, from 2016 through 2020, Plaintiff's APRI score was as follows: (1) April 14, 2016 - APRI = 0.56; (2) July 22, 2016 - APRI = 0.68; (3) February 21, 2017 - APRI = 0.53; (4) July 20, 2017 - APRI = 0.47; (5) February 4, 2017 - APRI = 0.28; (6) March 29, 2018 - APRI = 0.55; and (7) June 7, 2018 - APRI = 0.905.  (D.E. 182-1, p. 14; D.E. 182-3, p. 83).  Thus, under the applicable Hepatitis C Policy, Plaintiff's APRI score only exceeded the threshold for referral for likely treatment on June 7, 2018.

Plaintiff vigorously argues that Defendants continued to do nothing to treat him even in the wake of a diagnosis of possible early cirrhosis on May 22, 2018 and the APRI

score of over 0.9 on June 7, 2018. However, the objective medical evidence refutes Plaintiff's arguments, reflecting that: (1) PA McCoy met with Plaintiff on August 13, 2018 and recommended Plaintiff change his anti-seizure medication so that Plaintiff could be seizure free before starting on DAA therapy. (D.E. 182-1, p. 16; D.E. 182-4, p. 30); (2) PA McCoy ordered routine tests for Plaintiff and forwarded Plaintiff's medical records to the Medical Director of Virology for review. (D.E. 182-1, p. 16; D.E. 182-4, p. 31); (3) on November 9, 2018, Plaintiff reported to PA McCoy that he was seizure free (D.E. 182-1, pp. 16-17, D.E. 182-4, p. 36); (4) on November 13, 2018, Dr. Kahn approving Plaintiff for DAA treatment to begin on November 19, 2018. (D.E. 182-1, p. 17; D.E. 182-5, pp. 2-3); and (5) Plaintiff completed his Epclusa treatment on February 10, 2019, testing negative for the HCV virus in March 2019. (D.E. 178-1, p. 58; D.E. 182-1, p. 17; D.E. 182-5, p. 5).

Plaintiff further complains that Defendants Hancock, McCoy, and Kahn initially failed to refer Plaintiff for immediate DAA treatment despite knowing that Plaintiff's liver enzyme and AFP levels were high and that Plaintiff's ultrasounds results showed serious liver disease. While it is undisputed that Plaintiff's liver enzyme and AFP levels were elevated, Dr. Merwat stated that such "elevations are not markers of measurable fibrosis progression or stage." (D.E. 182-1, p. 19).

The uncontroverted summary judgment evidence reflects instead that, from 2015 to 2020, Plaintiff had multiple imaging studies of his liver to determine any evidence of decompensated cirrhosis or liver cancer. (D.E. 182-1, p. 19). The ultrasound images taken of Plaintiff's liver through 2017 showed no signs of significant liver disease. (D.E.

182-5, pp. 18, 20, 22). An ultrasound taken of Plaintiff's liver on May 22, 2018 indicated the possibility of early cirrhosis. (D.E. 182-5, p. 24). Plaintiff, however, has presented no evidence to suggest that his cirrhosis condition at this time had progressed to a serious stage requiring immediate treatment. As discussed above, PA McCoy and Dr. Kahn allowed for Plaintiff to receive DAA treatment, which commenced a few months later in November 2018.

Plaintiff vigorously argues that an image of his liver taken on March 7, 2019 revealed he had HCC, or liver cancer, and that Dr. Kahn and other medical officials failed to providing Plaintiff with proper medical treatment even after knowing he had been diagnosed with HCC. Plaintiff's argument is based on an understandable but erroneous interpretation of the March 7, 2019 CT Scan.

A review of the twelve-page UTMB clinical report associated with the March 7, 2019 CT Scan reveals that Plaintiff's diagnoses was formally listed in several places as liver cell carcinoma or HCC, which is liver cancer. (D.E. 184-1, pp. 13, 16, 21, 22). However, after reviewing the CT Scan image, the medical provider concluded in the final findings that there was no arterially enhancing lesion in Plaintiff's liver to suggest the presence of HCC. (D.E. 182-5, p. 30; D.E. 184-1, p. 19).[8] In an ultrasound subsequently taken on September 3, 2019, the medical provider found no evidence of any focal hepatic lesions. (D.E. 182-5, pp. 27-28). Lastly, a CT Scan taken on March 18, 2020 likewise

---

[8] Plaintiff correctly points out that the medical provider reported in the preliminary findings that Plaintiff's liver had an LR3 lesion as well as hepatic cysts. (D.E. 184-1, p. 19). However, these were preliminary findings which were not included as part of the medical provider's final findings.

indicated no arterially enhancing hepatic lesions in Plaintiff's liver cancer as well as no evidence of HCC. (D.E. 182-5, p. 32).

The objective medical evidence, therefore, fails to show that Plaintiff's liver condition had progressed to an advanced stage of either fibrosis, decompensated cirrhosis, or liver cancer before he was provided DAA treatment. Even assuming Plaintiff's May 2018 ultrasound was evidence of Plaintiff's liver condition deteriorating due to his Hepatitis C infection, the competent summary judgment evidence reveals that Plaintiff started receiving DAA treatment and that he was subsequently tested in March 2019 and found to be Hepatitis C negative. Lastly, the objective medical evidence fails to demonstrate evidence of HCC in Plaintiff's liver both before and after he completed the regimen of DAA treatment in late 2018 and early 2019.

Overall, to the extent he claims that Defendants Hancock, McCoy, and Khan acted with deliberate indifference through the medical treatment provided for Plaintiff's Hepatitis C and related conditions, the objective medical evidence presented rebuts any claim that his Hepatitis C complaints were intentionally ignored, that these defendants refused to provide him with care, or that they intentionally or wantonly delayed medical care for his Hepatitis C condition. *See Baneulos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference"); *Turner v. Moffett*, No. 3:12-CV-220, 2013 WL 5214070, at *3 (S.D. Tex. Sep. 17, 2013) (recognizing that the court may find allegations to be implausible when contradicted by the objective medical evidence); *Alexander v. Dickerson*, No. 6:08cv404, 2009 WL 2244139, at *9 (E.D. Tex.

Jul. 27, 2009) (concluding that conclusory allegations or unsubstantiated assertions cannot defeat a summary judgment motion).

Plaintiff's complaints about his medical care amount to little more than a disagreement over what constitutes adequate testing and treatment for his condition. *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted). Similar claims challenging the individualized medical judgment exercised by prison medical staff in determining the appropriate course of Hepatitis C treatment likewise did not give rise to a constitutional violation. *See Roy v. Lawson*, 739 F. App'x 266, 267 (5th Cir. 2018) (concluding that a prisoner's "challenge to the medical judgment exercised by prison medical staff in determining the appropriate course of his Hepatitis C treatment …does not give rise to a constitutional violation"); *Hendrix v. Aschberger*, 689 F. App'x 250, 250 (5th Cir. 2017) (per curiam) (holding that failure to provide requested Hepatitis C medication did not state a claim of deliberate indifference); *Vasquez v. Morgan*, No. H-18-3978, 2019 WL 2393428, at *3 (S.D. Tex. June 6, 2019) (holding that the decision not to prescribe the DAA Epclusa was a matter for medical judgment and therefore not actionable under the Eighth Amendment).

As discussed above Plaintiff has not offered competent evidence that Defendants were deliberately indifferent to his serious Hepatitis C infection and related liver issues and, therefore, does not present a genuine issue of material fact as to his Eighth Amendment claims. Accordingly, even when viewing the evidence in a light most

favorable to Plaintiff, he fails to establish that relief is available under § 1983. The undersigned respectfully recommends that Defendants should be entitled to summary judgment in their favor as to Plaintiff's Eighth Amendment claims.

## B.    Qualified Immunity

Defendants contend that they are entitled to qualified immunity which shields them from constitutional liability in their individual capacities. (D.E. 178, pp. 12-13; D.E. 182, pp. 9-19). The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). "To discharge this burden, the plaintiff must satisfy a two-prong test. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, he must claim that the defendant committed a constitutional violation under current law. *Id.* Second, he must claim that the defendant's action was objectively reasonable in light of the law that was clearly established at the time of the complained-of actions. *Id.*

It is often but not always appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation has occurred. *See Pearson*, 555 U.S. at 236. In this case, because Plaintiff has failed to state cognizable constitutional

claims against Defendants, it is not necessary to examine whether Defendants' actions were objectively reasonable. Accordingly, the undersigned respectfully recommends that Defendants are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims asserted against them in their individual capacities.

### C.    Eleventh Amendment

Defendants Linthicum and Black-Edwards contend that they are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacities for injunctive relief. (D.E. 178, pp. 13-15). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotations and modifications omitted).

Plaintiff's claims seeking injunctive relief against Defendants Linthicum and Black-Edwards in their official capacities are subject to dismissal on the basis that Plaintiff's underlying deliberate indifference claims lack factual support. *See Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. Sep. 28, 2015) (explaining that "a claim for injunctive relief is a remedy that does not stand alone, but requires a viable underlying legal claim"). Furthermore, because Plaintiff cannot establish his Eighth Amendment claims, he cannot show that he is suffering from an continuing violation of his Eighth Amendment rights. Accordingly, the undersigned respectfully recommends

that Plaintiff's claims against Defendants Linthicum and Black-Edwards in their official capacities for injunctive relief are barred by the Eleventh Amendment.

### D.     Plaintiff's Remaining Motions

#### (1)     Motion for Preliminary Injunction

Plaintiff seeks preliminary injunctive relief in the form of receiving an evaluation and treatment because he has been diagnosed with liver cancer.  (D.E. 156).  In order to obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest. *Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 536-37 (5th Cir. 2013). Injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance. *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013) (internal citations and quotations omitted).

Plaintiff must carry the burden as to all four elements before a preliminary injunction may be considered. *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (internal quotations and citations omitted).  As discussed above, Defendants should be granted summary judgment on all of Plaintiff's deliberate indifference claims. Plaintiff, therefore, cannot establish a substantial likelihood of success on the merits of such claims.  Based on the medical attention and treatment that has been and is being

provided to him, Plaintiff also has not established he will suffer irreparable harm if the injunction is denied.

Accordingly, because Plaintiff cannot establish all of the elements necessary for preliminary injunctive relief, the undersigned respectfully recommends that Plaintiff's Motion for Preliminary Injunction (D.E. 156) be denied.

### (2)    *Motion for Obstruction of Justice*

Plaintiff asks the Court to find that Defendants have obstructed justice by intentionally omitting evidence material to his deliberate indifference claim.  (D.E. 224). Specifically, Plaintiff claims that Defendants failed to submit a page from a March 7, 2019 CT scan report that showed Plaintiff as having liver cancer.   (D.E. 224, pp. 5, 9).

The undersigned has addressed and considered the objective medical evidence, including the entire March 7, 2019 CT scan as submitted by the parties, in determining whether summary judgment was appropriate in this case.  Plaintiff provides no evidence to show that Defendants intended to deceive the Court or otherwise obstruct the Court's ability to address the issues in this case.  As all of the relevant medical evidence was presented and considered by the undersigned, Plaintiff has failed to show he was prejudiced as a result of Defendants' actions in submitting their summary judgment motions and attached exhibits.   Accordingly, the undersigned respectfully recommends that Plaintiff's Motion for Obstruction of Justice (D.E. 224) be denied.

## VII.   RECOMMENDATION

Defendants have demonstrated that no genuine issue of a material fact exists as to whether they were deliberately indifferent to Plaintiff's serious medical needs, their

entitlement to qualified immunity, and whether Plaintiff's claims for injunctive relief are barred by the Eleventh Amendment. Thus, it is respectfully recommended that Defendants' motions for summary judgment (D.E. 178, 182) be **GRANTED** and that Plaintiff's deliberate indifference claims against them be **DISMISSED with prejudice**.

The undersigned further recommends that the Court: (1) **GRANT** the Motion to Strike (D.E. 202) filed by Defendants Black-Edwards and Linthicum; (2) **STRIKE** Plaintiff's motions for summary judgments (D.E. 184, 185, 193)[9], Plaintiff's untimely responses (D.E. 193, 194, 195, 196, 197, 198, 199, 200, 201, 210, 211, 212, 213, 214, 215, 216, 217, 219, 222), Defendants Advisory (D.E. 218), Plaintiff's responses to the Advisory (D.E. 219, 220, 221, 223, 225, 226), and Plaintiff's motion to liberally construe his summary judgment motions and responses (D.E. 227); (3) **DENY** Plaintiff's Motion to Show Cause for Excusable Neglect (D.E. 208); (4) **DENY** Plaintiff's Motion for Preliminary Injunction (D.E. 156); and (5) **DENY** Plaintiff's Motion for Obstruction of Justice (D.E. 224).

Respectfully submitted this 12th day of July, 2021.

Jason B. Libby
United States Magistrate Judge

---

[9] As set forth above, Plaintiff's Docket Entries 184 and 186 should not be stricken to the extent they are construed as his responses to Defendants' summary judgment motions.

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).